FILED
2013 AUG 1 P 3:24
CLERK
U.S. BANKRUPTCY
COURT - PGH

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| BROWNSVILLE PROPERTY | : | Case No. 10-21959-TPA |
| CORPORATION, INC. | : | |
| *Debtor* | : | Chapter 7 |
| | : | |
| | | |
| FALCK PROPERTIES, LLC, | : | Adv. No. 12-2029-TPA |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| WALNUT CAPITAL REAL ESTATE | : | |
| SERVICES, INC., MICHAEL LOZER | : | |
| and SUSAN SESCZYNSKI, | : | |
| *Defendant*s | : | |

Appearances:  David Fuchs, Esq. for the Plaintiff
Richard Parks, Esq. for the Defendants


## **MEMORANDUM OPINION**


This adversary proceeding was originally filed in state court but subsequently

removed to this Court by the Defendants.  The case centers around a failed bankruptcy-related sale

where Plaintiff was to have purchased some property owned by the Debtor herein, Brownsville

Property Corporation, Inc. ("BPC" ), as well as some property owned by Brownsville Health

Solutions, Inc. ("BHS"), a related  entity that was a debtor in its own bankruptcy case at Case No.

09-20998-TPA.  A non-jury trial was held on February 20, 2013.  The Parties filed post-trial briefs

and closing arguments were heard  on April 16, 2013.  For the reasons that follow, the Court finds

in favor of Plaintiff and awards damages of $178, 492.[1]

## *FACTS*

BHS filed its Chapter 7 petition on February 18, 2009 and Robert Slone ("Slone") was appointed as Trustee.[2]   BPC filed its Chapter 7 petition on March 22, 2010 and  Slone  was appointed Trustee in that case as well.  BPC  owned real property in Fayette County located at 125 and 127 Simpson Road, Brownsville, Pa.  A hospital facility had been constructed on 125 Simpson and a medical office building had been constructed on 127 Simpson Road.   BHS owned real property located at 104 Simpson Road on which an office building had been constructed.  (104, 125 and 127 Simpson Road are referred to hereinafter, collectively, as "the Property").

Before the Property had been transferred to BPC and BHS, it had been owned by

---

[1]     The Court previously determined that it at least had "related to" jurisdiction to hear this case and possibly "arising in" jurisdiction for a core matter under *28 U.S.C. §157(b)(2)(A)*.  See Memorandum Order of June 7, 2012, Doc. No. 33.  The Plaintiff initially questioned the power of the Court to issue a final decision in this case on the basis of the decision in *Stern v. Marshall*, ___ U.S. ___, 131 S.Ct. 2593 (2011), but it subsequently withdrew any such objection and thereby consents to this Court's authority to enter a final judgment.  *Audio Tr. of April 12, 2012 hearing* at 10:06:27 *et seq*.  Since both Parties consent to entry of a final judgment (the Defendants having removed the matter to this Court), this Court has authority to do so. *See, In re River Entertainment Co.,* 467 B.R. 808 (Bankr. W.D. PA. 2012). As such, this *Memorandum Opinion* also represents the Court's findings of fact and conclusions of law under *Fed.R.Bankr.P. 7052*, incorporating *Fed.R.Civ.P. 52(a)(1)*.  Nevertheless, if the District Court determines under the holding in *Stern* that this Court does not have the authority to enter final judgment, then this *Memorandum Opinion* and the accompanying *Order* shall constitute proposed findings of fact, conclusions of law and recommendation to the District Court.

[2]     Some of the facts as stated herein are derived from the docket entries in the BHS case and the main BPC bankruptcy case.  The Court can take judicial notice of the docket in these cases and the contents of the documents filed therein for the purpose of ascertaining the timing and status of events in the case and facts not reasonably in dispute.  *See, In re Ramreddy, Inc.,* 440 B.R. 103, 107 fn. 8 (Bankr. E.D. Pa. 2009); *Fed. R. Evid.  201.*

another related entity, Brownsville General Hospital, Inc. ("BGH"), which had been a debtor in its

own bankruptcy case, Case No. 06-20253, filed on January 24, 2006.  A plan of liquidation was

confirmed in the BGH Bankruptcy and attorney Robert Bernstein was designated as the Plan

Administrator.  In that capacity, Bernstein pursued fraudulent transfer claims against BPC and BHS

related to the transfer of the Property by BGH to them.  These claims were eventually settled in late

2008, and the end result was that Bernstein, as Plan Administrator, secured a mortgage on the

Property.  That mortgage, however, was junior to mortgages held by Parkvale Bank ("Parkvale").

This state of affairs set up a dynamic in the BPC and BHS Bankruptcies over the next few years

whereby Parkvale was seeking relief from stay so the Property could be sold at a sheriff sale, while

Bernstein, in alliance with Slone, was seeking to prevent that from happening so the Property could

instead be sold in the bankruptcies at an amount sufficient to pay off the Parkvale claim and still

leave monies available to pay claims in the BGH bankruptcy.  Except as noted hereafter, the specific

details of how that dynamic played out are not critical for present purposes

Plaintiff Falck Properties, LLC ("Falck") is a Pennsylvania limited liability company

that owns 21 rental units, and whose managing member is Barry Langan.  Defendant Walnut Capital

Real Estate Services, Inc. ("Walnut") is a Pennsylvania corporation that is engaged in the business

of providing real estate brokering and sales service.  Susan Lesczynski is a real estate broker and

has been an employee of Walnut since 1998.  She has been licensed as a real estate broker in

Pennsylvania since 2000.  Michael Lozer is a licensed Pennsylvania real estate agent and worked

for Walnut as an independent contractor sales agent from 2000 through "2011 or 2012."  Lesczynski

was Lozer's supervisor at Walnut.

3

In early 2010, prior to the BPC Bankruptcy filing, Lozer had a discussion with Kirk Burkley), an attorney in Bernstein's office, who was an acquaintance of Lozer. Burkley asked whether Lozer might be interested in listing the Property. Lozer was unfamiliar with the Property and Burkley gave him a description of it. Burkley explained that he anticipated being appointed a "receiver" for the Property and would need a real estate agent to help sell it. Lozer expressed an interest to Burkley in listing the Property to Burkley.

Lozer relayed the possibility of listing the Property to Lesczynski, and the two worked together on preparing listing agreements for that purpose. In order to obtain information about the Property, they accessed the Fayette County Assessment Office web site, which indicated that the Property was zoned residential and the use was commercial. Tr. at 107:2-7; 145:19-24. Lozer followed that exercise by making a telephone call to the number listed on the web site. The phone was answered as "Fayette County Assessment Office" and a woman who identified herself as "Genie" informed Lozer that the zoning on the Property was commercial and the use was commercial. Tr. at 146:13 - 147:3. Despite having conflicting zoning information from the web site and the telephone call, Lesczynski and Lozer thereupon inserted "Commercial" under the space for the "Zoning Classification" in the three listing agreements, without qualification and without doing any further investigation. Tr. at 147:4-20. The record is unclear as to the exact date these listing agreements were prepared, but they were signed on February 18, 2010. *See* Exhibit B.[3]

---

[3]    The listing agreement for 104 Simpson Road was not introduced as an exhibit at trial, but it is attached as an exhibit to the motion to employ Walnut that was filed in the BHS Bankruptcy, see BHS Doc. No. 186. This listing agreement is substantially identical to the agreements for 125 Simpson Road and 127 Simpson Road that were introduced at trial as Exhibit B.

In addition to preparing the listing agreements, that same date Lesczynski and Lozer also prepared and submitted materials to the "West Penn Multi-list," a database used by other real estate agents in that organization to obtain information about properties that are for sale. Consistent with the listing agreements, the multi-list materials that were submitted show the zoning of the Property as "com." *See* Exhibit C.

On May 7, 2010, Slone filed a *Motion by Trustee to Hire Real Estate Agent* in both cases*,* BPC  Doc. No. 26 and BHS Doc. No. 186,  pursuant to which he sought leave of Court to retain Walnut  for the purpose of assisting him in an effort to sell the Property.   The list price / commission proposed for each of the parcels was $2,950,000 / 6% for 125 Simpson,  $1,200,000 / 7%  for 127 Simpson, and $349,000 / 7% for 104 Simpson.   The listing agreements that had been prepared by Lesczynski and Lozer were attached to these motions.  On June 8, 2010 the motions were granted and Walnut was employed as a real estate agent to sell the Property.  BPC Doc. No. 62, BHS Doc. No. 196.

As alluded to above, prior to the employment of Walnut,  and continuing thereafter, Parkvale made efforts to obtain relief from stay and/or to have the BPC and BHS Bankruptcy cases dismissed so that it could pursue a sheriff's sale of the Property.  On August 18, 2010, the Court entered an Order in the BPC Bankruptcy that, *inter alia*, established a deadline of November 15, 2010, for a closing on the sale of the Property to occur, failing which  the bankruptcy case would be dismissed and Parkvale would be free to proceed with a sheriff sale on November 18, 2010.  The Order also required Bernstein to pay $40,000 to Parkvale each month in the interim to keep the

5

automatic stay in place. *See* BPC  Doc. No. 104.  Needless to say, the imposition of this deadline

infused a certain level of urgency into the efforts by Bernstein and Slone to sell the Property.

On September 1, 2010, without having a stalking horse buyer in hand, Slone filed

motions seeking to have the Property sold at a public auction sale.  BPC  Doc. No. 112, BHS Doc.

No. 207.  A public auction sale was held on  September 28, 2010, but no bidders showed up and the

motions were withdrawn as moot.  The understanding at that point was that the relief from stay

would be lifted effective October 1, 2010, and the sheriff sale would be held on November 18, 2010,

although counsel for Parkvale noted that if a buyer surfaced in the meantime Parkvale would be

willing to listen and bring the matter  back before the Court if a deal that made sense was being

proposed.  *See* BPC Doc. No. 144.

Falck had first become aware that the Property was for sale  around September 2010

when Lozer sent some documents about it to Karen Frank, a consulting financial officer for Falck.

Frank and Lozer had gotten to know each other earlier in 2010 in connection with another

commercial real estate project.  Lozer sent the material about the Property to Frank because she had

informed him that Falck might be interested in purchasing other commercial property.  Frank did

not immediately review the material about the Property, but did so by mid-September.  Among the

documents sent by Lozer to Frank were the multi-list descriptions  for the individual parcels, all of

which showed a zoning designation of commercial.  *See* Exhibit C.

Frank first visited the Property on behalf of Falck in early October 2010.  Large signs

had been placed on the Property by Walnut indicating that it was "commercial land" for sale.  Tr.

at 34: 19 - 35: 15; *See* Exhibit D.  At the  time of Frank's first visit, two or three doctor's offices

were operating at 127 Simpson Road, and two doctor's offices and a credit union were operating at 104 Simpson.  The hospital facility on 125 Simpson Road was not operating at the time, having ceased operations in February 2009.  Frank and/or Langan visited the Property on behalf of Falck five to seven times over the course of the next several weeks, looking into various matters pertinent to a decision as to whether to pursue a purchase of the Property.  Frank and Langan reviewed existing tenant leases, rent rolls, utility bills, other materials provided by Walnut, and the multi-list information.  Frank had numerous discussions with Lozer during the visits to the Property in which they talked about  what had happened in the bankruptcy court, the bidding process involved in obtaining court approval,  and the timeline required for any sale of the Property.  They also discussed the potential uses that Falck was considering for the Property, including university student housing, additional medical tenants, an urgent care facility tenant, and other commercial/business tenants.  Tr. at 34: 12-18; 35: 18-36: 15.  During this period of time, Frank researched the relevant bankruptcy filings on PACER, including the listing agreements that also showed the Property as commercial.  Tr. at 63:9-19; 97:4-7.

Falck made a decision to try to purchase the Property sometime in October 2010. Frank first talked with Lozer and Bernstein on November 4, 2010, about the possibility of Falck submitting an offer.  A first draft of a "letter of intent" was then prepared by Frank.  That document, along with a $50,000 check as a hand money deposit by Falck  was conveyed by Lozer to Slone and Bernstein for review.  Tr. at 37: 14-23.  They suggested some changes, including an increase in purchase price, Tr. at 37: 23-38 - 6.  Burkley was also involved in these negotiations and Lozer was aware of what was going on.  Tr. at 65:2-13.  Eventually a final version acceptable to all was completed on November 10, 2010. *See* Exhibit E ("Letter of Intent").  The Letter of Intent provided

7

for  a purchase price of $1,800,000.  It also called for Falck to make a hand money deposit of $50,000, and then  an additional $50,000 deposit upon court approval.  The Letter of Intent stated that it was not contingent upon financing – but was contingent upon free and clear title and court approval.

Frank testified credibly that Falck believed the Property to be zoned "business/commercial" at the time the Letter of Intent was signed, and that this belief was based on the MULTI-list information provided by Walnut, the fact that commercial entities were operating on the Property, and the signs that had been placed on the Property.  Tr. at 39: 10-19; 97: 16-21.  The belief that the Property had a commercial zoning designation was an important factor in Falck's interest in acquiring it.  Tr. at 36: 23-37: 1.

The Letter of Intent provided for a closing date to occur on or before January 31, 2011 or 75 days from bankruptcy court approval.  Frank testified that this was to allow time for due diligence to be done.  Tr. at 42: 8 - 13.  There was no financing contingency because Falck had been pre-approved for  financing to purchase the Property, subject only to court approval of the sale and an appraisal.  Tr. at 43: 12-23.  Furthermore, and in any event, based on the preceding events in this case, as described above, it is highly unlikely that the Court would have approved of any proposed agreement that included a financing contingency.

On November 12, 2010, Slone filed expedited motions seeking approval of the proposed sale of the Property to Falck.  BPC Doc. No. 146, BHS Doc. No. 227.  The  motions recited the terms of the proposed sale and noted that expedited treatment was necessary due to the impending Parkvale sheriff sale scheduled for November 18, 2010.  Parkvale filed vigorous

8

objections on November 16, 2010, indicating it opposed the sale unless certain conditions providing additional protections to Parkvale were imposed. BPC Doc. No. 153, BHS Doc. No. 233.

The Court convened an expedited hearing on November 17, 2010, to consider the sale motions. Frank attended this hearing. Tr. at 68:25-69:6. After a fairly lengthy hearing at which Slone, Bernstein and Parkvale were all heard from, the Court reimposed the automatic stay (thereby staying the Parkvale sheriff sale) and permitted the proposed sale to Falck to continue moving forward, but with certain added conditions. The $50,000 in hand money previously paid by Falck to Slone was to be immediately paid over to Parkvale, plus Falck was to pay an additional $100,000 to Parkvale by November 25, 2010. *See* BPC Doc. No. 158. This total hand money of $150,000 to be paid by Falck was to be non-refundable except if Slone discovered he could not convey good title, or Falck was not ultimately the successful bidder. Bernstein also agreed to contribute $30,000 to the hand money pool, making for a total of $180,000, or 10% of the purchase price. A hearing on the sale motion, along with a public auction to be conducted if any other interested party appeared, was scheduled for December 1, 2010.

Following the November 17th hearing Falck retained an attorney to do a title search on the Property. Falck also requested copies of any appraisals that Parkvale had on the Property because Frank was hoping that a recent appraisal may have been done during the bankruptcy cases. After signing a non-disclosure form, she was supplied with two appraisals on November 23, 2010. The two appraisals both included statements that the Property was zoned residential. One of the appraisals was from 2004 and the other was from 2007, however, the latter appraisal did not include the parcel with the hospital building. No one from Falck sufficiently reviewed the appraisals at that

9

time so as to actually notice the information about zoning.

When the December 1st hearing was held, no other bidders appeared  and the sale to Falck was  approved on that date.  The Sale Order also provided that closing was to occur on or before January 31, 2011, or Parkvale would be granted relief from stay and permitted to proceed with a sheriff sale.  BPC Doc. No. 179.

Following the December 1st hearing, Falck undertook numerous tasks to prepare for the closing on the Property, including negotiations with existing tenants, solicitation of contractor bids for work to be done on the Property, dealing with  an appraisal, making arrangements for insurance, and working out some issues raised by the title report.  For instance, the title report indicated there was a previously unknown gas lease on the Property which issue also had to be resolved prior to closing.  Falck also began providing general repair and maintenance on the Property, and continued to do so for the next several months until all prospects for consummation of the sale had failed.  On December 5, 2012, the hospital building was vandalized, with a large amount of copper piping being ripped out.  Falck had the piping replaced at its expense so that the water could be turned on and the boiler started.

The new appraisal referred to above was required by the  company that was going to provide "bridge financing" for Falck.  On December 13, 2012, an appraisal was ordered by that lender.  On December 15, 2010, the appraiser visited the Property for the first time and spoke with Langan.  The appraiser came back to the Property a day or two later, at which time he made a comment to Langan to the effect that an issue with zoning existed since the Property appeared  to

be zoned residential. Tr. at 48:10-25; 78:11-19. This was the first time Falck actually became aware of any reason to suspect the Property was not zoned commercial.

When Langan reported this information to Frank, she panicked and began calling "anyone and everyone" in an effort to find out what had happened. She spoke with Lozer and was told by him that Lesczynski had gotten the zoning information from Fayette County. Tr. at 51:5-12. She spoke with the attorney Falck had hired to do a title report on the Property, and also with Michael Shiner ("Shiner") one of Parkvale's attorneys. Shiner pointed out to Frank that one of the appraisals he had sent to her on November 23rd included information indicating the zoning was residential, and at that time she dug into the appraisal and actually read that information for the first time. Tr. at 82:4-15.

Frank also called Fayette County herself and spoke initially with the Chief of Zoning, Dave Bukovan, who reviewed the matter for several days. Bukovan eventually referred her to the Fayette County Director of Zoning, Sara Rosiek. Frank asked Rosiek to see if a variance had been granted for the Property, or how otherwise it had been able to operate as commercial property. Rosiek reported back to Frank on January 24, 2011, with final confirmation that the Property was, in fact, zoned R-1 residential. Rosiek made clear the Property would need to be rezoned if the medical offices were going to continue to operate or for any of the other uses that Falck had planned to make of the Property. The zoning status of the Property as R-1 residential affected Falck's ability to close on it because all of the funding arranged to date was based on it being commercial property.

11

Falck then proceeded to take several steps in response to the news about the zoning status of the Property.  One was, with Slone's permission, to petition Fayette County in late January 2011, for a rezoning of the Property from R-1 residential to B-1 business/commercial.  Frank testified that was done  because Rosiek advised her that was the course that needed to be taken.  On the other hand, Burkley testified that he advised Frank that instead of rezoning Falck should possibly be pursuing the alternative strategy of seeking a non-conforming use for the Property.  Burkley suggested she consult an attorney to discuss that possibility.  Falck did not take that advice, but instead pursued the rezoning process without an attorney.  Falck's rezoning efforts eventually came to an unsuccessful conclusion when it was denied by the Fayette County Commissioners after a February 10, 2011 hearing, and several months later, Falck's subsequent appeal to the Fayette County Court of Common Pleas was quashed.[4]

The other action taken by Falck was to file an *Emergency/Expedited Motion for Extension of Sale Closing or in the Alternative, Emergency Motion for Rescission*, BPC Doc. No. 200, on February 8, 2011.[5]  As indicated by its title, that motion sought either to have the sale deadline extended and the February 9th sheriff sale date postponed, or alternatively, to allow Falck to rescind  the sale agreement.  The two reasons noted for the relief requested in the motion were: (1) the discovery that the property was zoned residential, which the motion alleged meant a

---

[4]    The  appeal was quashed at the behest of Parkvale after it had purchased two of the parcels of the Property at a sheriff sale. That incident was among the subjects involved in another adversary proceeding filed by Falck.  *See, Falck v. Parkvale Bank*, Adv. No. 12-2054,  which was resolved by a settlement agreement between the parties.

[5]    The motion alleged that the Parties had previously agreed among themselves to extend the closing deadline from  January 31, 2011 to February 9, 2011, with the Parkvale sheriff sale scheduled for February 10, 2011.

significant reduction in the appraised value of the Property; and, (2) an inability by Falck to obtain

financing exacerbated by the discovery of significant real estate taxes owed on the Property.  Falck

alleged that, with some extra time, it thought both of these issues could be satisfactorily addressed

to allow the sale to proceed.

An emergency hearing was scheduled for February 9, 2011 at 10:00 A.M.  The Court

indicated at that time it was prepared to deny the motion, but that it would be preferable if the Parties

could first  confer and possibly  work out some agreement which might allow for a  sale to Falck.

The Parties did reach an agreement whereby Parkvale would proceed with the sheriff

sale scheduled for the next day but Falck would be given until March 26, 2011, to close on a

purchase of the Property from Parkvale for $1,800,000 – Parkvale agreeing not to try to market the

Property to anyone else in the meantime.  Falck also agreed to continue to provide maintenance on

the Property until March 26th or until it notified Parkvale that it would not proceed with a closing.

Falck's alternative request for a rescission was denied, Parkvale remaining steadfast that the hand

money would be defaulted if no closing occurred.  Falck did not close on the Property by the March

26th deadline.  The subsequent quashing of the pending state court rezoning appeal by Parkvale

ended any possibility of the sale occurring.

## *LEGAL DISCUSSION*

### *(A)  General Standard for Negligent Misrepresentation*

The *Amended Complaint* sets forth two separate counts against the Defendants based

on the same set of facts, one under a generic heading of negligence and the other under a heading

of negligent misrepresentation. As has previously been communicated to the Parties by the Court,

without eliciting any disagreement from them, it appears that the two counts are essentially the

same claim stated in two different ways since negligent misrepresentation is a species of negligence.

In deciding the case, the Court will therefore "collapse" the two counts into one and apply the law

of negligent misrepresentation, which in Pennsylvania may be summarized as follows:

> Negligent misrepresentation requires proof of: (1) a misrepresentation of a
> material fact; (2) made under circumstances in which the misrepresenter
> ought to have known its falsity; (3) with an intent to induce another to act
> on it; and (4) which results in injury to a party acting in justifiable reliance
> on the misrepresentation. The elements of negligent misrepresentation differ
> from intentional misrepresentation in that the misrepresentation must
> concern a material fact and the speaker need not know his or her words are
> untrue, but must have failed to make a reasonable investigation of the truth
> of these words. Moreover, like any action in negligence, there must be an
> existence of a duty owed by one party to another.

*Milliken v. Jacono*, 60 A.3d 133, 141 (Pa. Super. 2012) (quoting *Heritage Suveyors & Engineers,*

*Inc. v. National Penn Bank,* 801 A.2d 1248 (Pa. Super 2002)).

It can thus be seen that, in addition to the overarching requirement of the existence

of a duty of care owed by the Defendants to Falck, there are four basic elements necessary to a

successful negligent misrepresentation claim. Furthermore, the burden of proof in a negligent

misrepresentation claim is on the Plaintiff and measured by a preponderance of the evidence. *See,*

*e.g., Fort Washington Resources, Inc. v. Tannen*, 858 F. Supp. 455, 461 (E.D. Pa. 1994). For

purposes of discussion, the Court will reverse the order of review referenced in *Milliken* and first

examine the question of duty of care because, if there was no duty of care, it is irrelevant whether

Falck proves the four numbered elements.

### *(B)  Duty of Care*

The legal issue presented is whether under Pennsylvania law the Defendants, acting as the agents of Slone in connection with the sale of the Property, and themselves having no contractual privity with Falck, nevertheless had a duty of care to Falck as a potential buyer of the Property when supplying information to Falck about the zoning of the  Property.  Speaking in general terms, the determination of whether a duty of care exists in a particular case involves weighing a number of factors, including: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and the foreseeability of the harm incurred; (4) the consequences of imposing a duty on the actor; and, (5) the overall public interest. *See, Spence v. ESAB Group, Inc*., 623 F.3d 212, 217 (3d Cir. 2010) (quoting *Althaus ex. rel. Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000)).

The Court has not been directed by the Parties to any controlling Pennsylvania Supreme Court case that is directly on point as to whether a duty of care existed in the circumstances presented,  nor has the Court found such case itself. The Plaintiff points to a number of intermediate appellate decisions from Pennsylvania that have recognized a basis for liability against a real estate broker based on misrepresentations made to buyers.  *See, e.g.*, *Glanski v. Ervine*, 409 A.2d 425 (Pa. Super 1979) ( jury award against broker who told buyer that termite-infested house was structurally sound upheld);  *Long v. Brownstone Real Estate Company*, 484 A.2d 126 (Pa. Super. 1984) (finding error in the grant of a compulsory nonsuit in favor of a real estate broker in suit alleging broker had misrepresented the history of flooding in the basement); *Skaybaugh v. Newman*, 479 A.2d 517 (Pa. Super 1984) (allegation that broker falsely told buyers that seller would only sell 3 farms together

15

as a unit was sufficient to state a claim for fraud); *Shane v. Hoffman*, 324 A.2d 532 (Pa. Super 1972) (broker who falsely told buyers that sewer was in good condition liable for fraud); and *Smith v. Renaut*, 564 A.2d 188 (Pa. Super 1989) (when a broker employed to sell real estate misrepresents or conceals a material fact he may be found liable to purchaser for damages). A review of these cases, however, reveals that they all either involve intentional misrepresentation, i.e., fraud, or they fail to articulate any principle that might be applied to determine when a broker might be held liable for a non-fraudulent misrepresentation, such as is alleged to have occurred here. The Court thus finds these cases are of limited usefulness in its determination as to whether Walnut and the individual Defendants had a duty of care to Falck.

The Plaintiff also points to a Pennsylvania Supreme Court case, *Bortz v. Noon*, 729 A.2d 555 (Pa. 1999), in support of its argument that there was a duty of care owed in these circumstances. In that case, the plaintiffs contracted to buy residential property and applied for financing. One of the conditions to obtain a mortgage commitment was for the property septic system to pass a dye test. The real estate agent for the sellers referred the plaintiffs to a contractor to perform the test. The contractor did so and informed the sales agent that the septic system failed the test. The agent then informed the plaintiffs about the test failure. The agent also told the plaintiff buyers that the sellers had the option of repairing the septic system, that they had elected to do so, and that they had hired another contractor for that purpose. About a month later someone from the title company called the agent to state that the septic system had now passed the dye test, and the closing could be scheduled. The agent relayed this verbal information to the plaintiffs and a closing was scheduled. Neither the agent nor the plaintiffs were ever given a written verification that the septic system had actually passed the dye test. A closing was held and the settlement officer

16

from the title company verbally told everyone present, including the agent and the plaintiffs, that the system had passed the dye test.

Following the closing, the plaintiffs discovered that the system had not actually passed a dye test and that they would have to connect to the public sewer system at great expense. The plaintiffs sued a number of parties involved in the transaction, including the sales agent. One of the theories of liability against the sales agent was negligent misrepresentations. In finding that the sales agent could not be liable for negligent misrepresentation under the facts presented, the court held that "a real estate broker has no duty to make an independent investigation of a contractor's report, where the real estate broker did not have any agency or contractual relationship with the third party. 729 A.2d at 563. Importantly for present purposes, however, the *Bortz* court was careful to note that its decision was not a recognition of a "per se" protection against liability to prospective buyers for real estate brokers and agents for their negligence or negligent misrepresentation, but rather was based on the "unique circumstances of this case." *Id.* In the present case, the evidence established that the incorrect information about the zoning status of the Property was generated by the Defendants themselves, and not simply something they were told by Slone and then passed along to prospective buyers. Thus, *Bortz* is factually distinguishable from the present case and it does not foreclose the finding of a duty of care here, though it does not offer much guidance on how to make that decision either.

In the subsequent case of *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005) the court provided more clarity on the question of the duty of care in the context of a party that provides information that is used by another. The *Bilt-Rite* court, after a discussion

17

of the concept of duty of care in both a general sense, as well in the particular case of negligent

misrepresentation, concluded that it should formally adopt a portion of *Section 552* of the

*Restatement (2d) Torts* (1977) as the law of Pennsylvania.[6]  866 A.2d at 287.  That provision, which

is entitled "Information Negligently Supplied for the Guidance of Others," states in relevant part:

> (1)    One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2)    Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
>> (a)    by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>>
>> (b)    through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Restatement (2d) Torts, §552.*[7]

Based on this standard, the *Bilt-Rite* court concluded that an architect could be liable

---

[6]    The *Bilt-Rite* court emphasized that it did not view *Section 552* as supplanting the common law tort of negligent misrepresentation, but rather as "clarifying the contours of the tort as it applies to those in the business of providing information to others."  866 A.2d at 287.

[7]    *Section 552* also includes a Subsection 3 that provides:

> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

This Subsection was not implicated in *Bilt-Rite* and the court stated it was offering no view on whether it has any place in Pennsylvania law.

to a contractor who had been supplied with a "bid package" that included the architect's misrepresentations because it was foreseeable that the contractor would use the package to prepare its bid on the project. The court reached this conclusion even though there was no contractual privity between the architect and the contractor, and despite the "economic loss doctrine,"[8] which the court found does not apply to claims of negligent misrepresentation sounding under *Section 552*.

Following *Bilt-Rite,* the courts have applied its holding in various settings.[9] For instance, in *Excavation Technologies, Inc. v. Columbia Gas Company of Pennsylvania*, 985 A.2d 840 (2009) the defendant utility accompany failed to properly mark the location of its underground gas lines on a construction site. The plaintiff contractor subsequently struck a gas line while doing excavation work, delaying the project and thereby damaging the plaintiff. The plaintiff argued that the utility should be liable to it under *Section 552,* but the court distinguished *Bilt-Rite* because it found that, unlike the architect in that case, the utility company was not engaged in supplying information to others for pecuniary gain.[10] *See also, Azur v. Chase Bank, USA, N.A.*, 601 F.3d 212, 223 (3d Cir.2010) (credit card company not in the business of providing cardholder with information for pecuniary gain, so cardholder did not fall within *Section 552* liability); *Kirschner v. K & L Gates,*

---

[8]    Under Pennsylvania law the "economic loss doctrine" provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage. *See, Huckstein Mechanical Systems, Inc. v. IC Staffing Solutions, LLC*, 2013 WL 1776661 *3 (W.D. Pa. 2013) . In the present case, the Defendants did not plead the economic loss doctrine as a defense, but even if they had the exception to that doctrine recognized in *Bilt-Rite* would seem to apply.

[9]    Some have argued that the *Bilt-Rite* holding should be limited to "design professionals", such as architects. Nothing in *Bilt-Rite*, however, compels that conclusion and the Court finds that design professionals are just one example of a larger category of service providers in the business of supplying information to which *Section 552* may apply. *See, Matlack Leasing, LLC v. Morison Cogen, LLP*, 2010 WL *7-8 (E.D. Pa. 2010).

[10]    Under the Pennsylvania *One Call Act , see 73 P.S. §177,* the utility was required to respond to all requests for information about underground utilities within two days, and without remuneration.

*LLP*, 46 A.3d 737, 758-59 (Pa. Super 2012) ( law firms hired by special committee of corporation's board to conduct investigation could be liable to corporation for negligent misrepresentations in report that corporation relied upon).

Unfortunately, the Court has been unable to locate any cases applying Pennsylvania law reaching the question of whether a real estate broker who negligently supplies information to a potential buyer meets the criteria of *Section 552.*   Courts from other jurisdictions that have expressly adopted or which tacitly follow *Section 552*  seem to agree  that *Section 552* does apply in the circumstance of a real estate broker negligently supplying information to potential buyers. *See, e.g., Stechschulte v. Jennings*, __ P.3d __, 2013 WL 1497344 *16 (Kan. 2013) (negligent communication by broker is "fair game" under *Section 552*);  *DeWolfe v. Hingham Centre, Ltd.*, __ N.E. 2d __, 2013 WL 1442543 (Mass. 2013) (real estate broker had duty to exercise reasonable care in making representations to prospective buyers as to zoning status of property);  *Durbin v. Ross*, 916 P.2d 758, 764-65 (Mont. 1996) (buyers appropriately brought a negligent misrepresentation claim against broker alleged to have negligently misrepresented that property had a legal septic system); *Limoge v. People's Trust Co.*, 719 A.2d 888, 891-92 (Vt. 1998) (real estate agent had a duty of reasonable care under *Section 552* in conveying information as to area of property); *McCamish, Martin, Brown and Loeffler v. F.E. Appling Interests*, 991 S.W. 3d 787, 791 (Tex. 1999) ( stating that *Section 552* applies to real estate brokers).

The Court's own  plain reading of *Section 552* is in agreement with the cases cited above and the Court therefore finds that  a  real estate broker would fall within the scope of  that provision.  Brokers are in the business of conveying information for the guidance of others in their

20

business transactions.  Although that is not exclusively what they do, it is certainly a large  part of it.  Furthermore, like the architect in *Bilt-Rite* and the law firms in *Kirschner*, but unlike the utility company in *Excavation Technologies* or the credit card company in *Azur*, brokers have a direct pecuniary interest in doing so because by supplying such information they hope to induce a sale of the subject property and thereby obtain a sales commission.

The Court therefore concludes that the Defendants owed a duty of care in this case to Falck, as a prospective buyer of the Property, based on *Section 552*, as adopted in *Bilt-Rite* as the law of Pennsylvania.  The Court's conclusion in that regard is reinforced by certain statutory and administrative provisions of Pennsylvania law that indicate an intent by the Legislature to require real estate brokers to make sure they are conveying accurate information about the properties they are attempting to sell.

For instance, a provision under the Pennsylvania *Real Estate Licensing and Registration Act, 63 P.S. §455.101, et. seq.*, entitled "Prohibited acts," lists such things as making any substantial misrepresentation, pursuing a continued and flagrant course of misrepresentation, and using any misleading or untruthful advertising.  *See, 63 P.S. §455.604(a)(1), (3)*, and *(4)*. Another provision, entitled "Duties of licensee generally" provides that a licensee owes a non-waivable duty to any consumer to whom the licensee provides "real estate services"[11] to exercise reasonable professional skill and care, regardless whether the licensee is in an agency relationship with the consumer. *See, 63 P.S. §455.606a(a)(1). See also, 49 Pa. Code §§35.292 (a)(1), (9)* and

---

[11]    "Real estate services" is defined under the statute as an act or acts requiring a real estate license. *See, 63 P.S. 455.201*.  There is no doubt that in their interaction with Falck involving the Property in this case  the Defendants were engaging in real estate services.  *See, 63 P.S. §455.301*.

*35.333(a)(6)*.  It has long been recognized that, for negligence purposes, a duty of care may be established by statute, as well as through common law case development.  *See, DeJesus v. U.S. Dept. of Veterans Affairs*, 479 F.3d 271, 280-81 (3d Cir. 2007).  The existence of the provisions noted above in the *Real Estate Licensing and Registration Act* and its accompanying regulations is consistent with and supportive of the Court's finding of the existence of a duty of care under *Section 552*.

## *(C)  Elements of the Negligent Misrepresentation Claim*

Having found the existence of s duty of care under the facts presented, the Court may now move on to consider whether Falck has met its burden of proof with respect to the four numbered elements required to establish liability.  As indicated above, the required burden of proof is by a preponderance of the evidence.  *Fort Washington Resources, supra*.

The Court previously advised the Parties that, based on the evidence presented at trial, including the testimony of the Defendants' own expert witness, it had formed an initial impression  that the Plaintiff had met its burden of proof as to the first three elements of the tort claim.  That initial impression remains unchanged after further time to reflect and consider.  The Court does not believe extensive discussion is necessary as to those elements, but it will provide some brief comments as to each that will be sufficient to show the basis for the Court's conclusion in this regard.  The fourth element, justifiable reliance, will require more extended discussion.

*(1)    Misrepresentation of Material Fact*

As to the first element, it is undisputed that the Defendants made a misrepresentation when they stated explicitly in the multi-list system and implicitly in signs posted on the Property that it was zoned "commercial," when in fact it was zoned "R-1 residential."  The individual Defendants, who were acting as the agents of the corporate Defendant, admitted that the zoning information they provided was incorrect, or in other words, that they made a misrepresentation.  *See*, Tr.  at 112: 11-15; 151: 9-18.

A misrepresentation is "material," so as to provide a basis for a negligent misrepresentation claim, when it is of such character, that had it not been made, the transaction in question would not have been consummated.  *See, e,g.*, *In re Lewis*, 478 B.R. 645, 661 (Bankr. E.D. Pa. 2012); *Sevin v. Kelshaw*, 611 A.2d 1232, 1237 (Pa. Super. 1992).  Frank, the consulting financial officer for Falck, credibly testified that the zoning designation of the Property was important because Falck was specifically looking for investment commercial property, not residential.  Tr. at 31:16-21; 36:16 - 37:1.  She also testified that the Plaintiff would not have made an offer to purchase the Property if it knew that the Property did not have a commercial zoning designation.  Tr. at 52:13-16.  Lozer confirmed that it was his understanding that Falck was only interested in looking at commercial property, so he would have known the zoning of any property he might present to Falck was an important consideration.  Tr. at 148:7-15.

The Court accepts this testimony and finds that the misrepresentation of the Property's zoning status was "material."  *See also, Silverman v. Bell Sav. & Loan Ass'n*, 533 A.2d 110 (Pa. Super 1987) (misstatement by broker as to zoning of property to effect that rear of property

23

was zoned commercial and could be used for parking, when in fact it was zoned residential and

parking not allowed, was material where buyer would not have purchased property if actual zoning

was known).


*(2)   Knowledge of Falsity*

The second element of the negligent misrepresentation claim requires Falck to show

that the misrepresentation was made under circumstances in which the Defendants ought to have

known of its falsity.   The genesis of the improper zoning information for the Property was

demonstrated clearly by the evidence presented at trial.


After Walnut was retained to market the Property, Defendants Lesczynski and Lozer

prepared listing contracts.   In order to obtain information about the Property, they first went to the

Fayette County web site, which showed the Property as being zoned residential but having a

commercial use.   Defendant Lozer then called the Fayette County Assessment Office to ask about

the zoning and was told by someone named "Genie" or "Jeanie" that the Property was zoned

commercial and being used as commercial.   It was this telephone call,  and the decision by Lozer

and Lesczynski to accept it as an accurate statement of the Property's zoning,  that was the source

of all the Defendants' subsequent misrepresentations.  *See* Tr. at 144:15 - 147:20; 107:2 - 109:18.


The Court finds that under the circumstances presented the Defendants should have

known the zoning information they were providing was false.   There are two major reasons for this

conclusion.  First, the conflict between what the County web site stated about the zoning status of

the Property, and what Lozer was told by the Assessment Office, should have raised a  red flag.   It

24

should have been quite apparent that at least one of these sources had to be wrong about the zoning, and by simply electing to choose to believe one over the other, without doing any further investigation to confirm the true state of affairs, the Defendants should have known there was a probability they were providing false information that potential buyers would rely upon.  Second, the expert witnesses for both sides agreed that the Assessment Office was not the proper place to direct an inquiry as to zoning.  *See* Tr. at 208:3-11; 278:22 - 279:4.  As  real estate professionals, the Defendants can be charged with the  knowledge that the Assessment Office is not the proper place to inquire about  zoning information and that using that office, as a source for zoning information, would likely lead to getting inaccurate information.  Thus, the Plaintiff has met its burden of proof with respect to the  second element, knowledge of falsity.

### (3)    *Intent to Induce Action*

Under the third element, Falck  must show that the misrepresentation was made with an intent to induce another to act on it.  The zoning misrepresentation was made in the multi-list information for the Property, as well as on signs placed on the Property.  These are clearly marketing materials that, by definition, are intended to induce potential buyers to take an interest in the Property.  *See* Tr. at 109:7- 22; 134:24 - 135:1; 135:19 - 136:1.  Lozer sent the materials to Frank because he knew that Falck was interested in acquiring commercial property.  The Court has no trouble concluding that the third element has been sufficiently proven.[12]

---

[12]    Lesczynski testified that multi-list information is not generally available to the public, but only to multi-list subscribers.  Tr. at 137:6-10.  Had Falck somehow obtained the multi-list materials on its own, without involvement by Walnut, and despite Falck not being a multi-list subscriber, the intent to induce element would pose a  more difficult question.  Since, however, Walnut admittedly supplied those materials to Falck, the Court finds that it did so with an intent to induce Falck to have an interest in the Property.

*(4)   Acting in Justifiable Reliance on the Misrepresentation*

The fourth element required Falck to prove that it acted in justifiable reliance on the misrepresentation.[13]   The evidence was clearly sufficient to show that Plaintiff relied  on the misstated zoning designation by the Defendants.  Tr. at 40:2-9.  The real issue is whether such reliance was  "justifiable," something on which the Parties sharply disagree.  Falck argues that its reliance was justified because the Defendants were court-appointed professionals and there was limited time for the plaintiff to do its own investigation.  The Defendants claim that Falck could not have justifiably relied upon the misstated zoning designation because the zoning of the property was a matter of public record that could have easily been discovered by Falck itself upon proper inquiry. The Court begins its determination of whether Falck's reliance was justifiable by examining the relevant law.

The concept of justifiable reliance is very fact-specific and not susceptible to any "black letter"-type rules.  In deciding whether justifiable reliance has been demonstrated in a given case, this Court is instructed to consider the relationship of the parties involved and the nature of the transactions." *Tran v. Metropolitan Life Ins. Co.*, 408 F.3d 130, 135 (3d. Cir. 2005) (citing *Rempd v. Nationwide Life Ins. Co., Inc.*, 370 A.2d 366 (Pa 1977)).  The issue of whether reliance on the misrepresentation is justifiable is generally a question of fact which should be submitted to the jury, if there is a jury.  *Tran*, 408 F.3d at 139.

---

[13]      It will be noted that the fourth element of a negligent misrepresentation claim, as expounded in *Milliken, supra,* also includes a showing that the Plaintiff has been injured as a result of its justifiable reliance.  The Court believes this "injury" component naturally lends itself to and is best deferred to the discussion of damages.

"Justifiable reliance," as conceptualized above, is not always clearly defined or observed.  For instance, in *Field v. Mans*, 516 U.S. 59, 72-74 (1995) the Supreme Court, albeit in the context of determining what level of reliance should be applied in a non-dischargeability action under *11 U.S.C. §523(a)(2)(A)* and not in discussing negligent misrepresentation, referred to "justifiable reliance" as an "intermediate level of reliance" that was somewhere between "reasonable reliance" and reliance in fact.  In that case,  the bankruptcy court had applied a reasonable person, objective test for reliance and the *Field* court found that the case had to be remanded because the requirement of reasonableness "clearly exceeds the demand of justifiable reliance" that was found to apply. *Id.* at 77.

The Court finds that the approach in the *Field* case is the proper one to follow since the very term "justifiable" seems to connote a more individualized inquiry into the reliance as opposed to a purely objective test of a "reasonableness approach."[14]  The *Field* court, relying in part on the *Restatement (2d) Torts,* spoke of  what justifiable reliance means:

> The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable,

---

[14]      The Court does note that in *Calgon Carbon Corp. v. Potomac Capital Inv. Corp.*, 2007 WL 2907865 (W.D.Pa. 2007) the court gave a jury instruction in a negligent misrepresentation case to the effect that to show justifiable reliance plaintiff had to show it "exercised the diligence that a reasonable person under all the circumstances would have exercised to protect his own interests."  Although that sounds like a pure reasonable reliance standard, rather than the intermediate standard of *Field*, the court rejected a post-trial challenge to the jury instruction.  A review of the relevant documents in *Calgon*, however, shows that the substance of the jury instruction was never challenged, only whether it had been given.  In other words, the parties never argued and the court never considered whether the jury instruction in question was an accurate statement of law.  In the absence of such analysis by the *Calgon* court, this Court does not view it as a binding statement of the applicable law, instead finding that it must follow the approach set forth in *Tran* and *Field*.

> even if he could have "walk[ed] across the street to the office of the register
> of deeds in the courthouse" and easily have learned of an unsatisfied
> mortgage. Here a contrast between a justifiable and reasonable reliance is
> clear: "Although the plaintiff's reliance on the misrepresentation must be
> justifiable ... this does not mean that his conduct must conform to the
> standard of the reasonable man. Justification is a matter of the qualities and
> characteristics of the particular plaintiff, and the circumstances of the
> particular case, rather than of the application of a community standard of
> conduct to all cases." Justifiability is not without some limits, however. As
> a comment to § 541 [of the Restatement] explains, a person is "required to
> use his senses, and cannot recover if he blindly relies upon a
> misrepresentation the falsity of which would be patent to him if he had
> utilized his opportunity to make a cursory examination or investigation."

516 U.S. at 70-71 (citations omitted, as quoted in *In re Taylor*, 195 B.R. 624, 628-29 (Bankr.

M.D.Pa. 1996). *See also, e,g., Toy v. Metropolitan Life Insurance Co.*, 928 A.2d 186, 207 (Pa.

2007) (stating that the rules in the *Restatement of Torts* as to the element of justifiable reliance have

been "embraced" by the court because they coincide with the court's own approach).

The *Restatement* provisions addressing justifiable reliance (*see*, *Restatement (2d)*

*Torts*, §§ 537-545A), including the ones that are referred to by the *Field* court in the above

quotation,  appear in Chapter 22, Topic 1 thereof, dealing with fraudulent misrepresentations,

whereas negligent representation is addressed in Chapter 22, Topic 3.  Nevertheless the standards

of liability for fraudulent misrepresentation and negligent misrepresentation *both* require a showing

of "justifiable reliance."  *See, Restatement (2d) Torts* §§ 525, 552.  That being so, it does seem

proper to look to those same provisions for guidance in the present case.

In that regard, *Restatement (2d) Torts, §540* is of particular significance for the

present case, given the Defendants' argument that the zoning of the Property was information that

was publicly available. *Section 540*  provides:

> The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.

*Restatement (2d) Torts, §540.  See also, Toy, supra*, ("we have relied on the principle that the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely"); *Silverman, supra*  (post-verdict holding that buyer (himself an attorney and real estate investor) who was recipient of incorrect zoning information from broker could not have justifiably relied upon it because he should have checked zoning himself reversed because "the law is clear that there is no obligation on the part of the purchaser to examine public records prior to purchase").  The Comments to *Section 540* further indicate that the rule stated therein holds true even if the investigation could have been done without any considerable trouble or expense.  *Id.* at *Comment a*.  Thus, the fact that it may have been relatively easy for Falck to determine that the Defendants had misrepresented the zoning status of the Property does not of itself militate against a finding of justifiable reliance.

There is an exception to the "no investigation required" rule if the recipient knows of the falsity of the information, or the falsity is obvious.  *See,  Restatement (2d) Torts §541.*  The Defendants did not contend that Falck actually knew the zoning designation was wrong at the time they relied upon it, nor is there any evidence that could support a finding that the falsity of the designation was obvious.  A representation that the property was zoned "commercial" would not have seemed obviously false since: (a) Falck had told Walnut it was only interested in considering commercial properties for purchase; and, (b) there were actually some commercial activities taking place on the property when Walnut provided the zoning information to Falck.

Accordingly, the Court concludes that the general rule under which a recipient of the misrepresentation of fact is justified in relying upon it without conducting an investigation applies, and as a result, Falck's failure to investigate the zoning does not require a finding that its reliance was unjustified. As this was the Defendants' strongest argument, or at least the one most vigorously pressed by them, such a finding, i.e., that the fourth element has not been met, is undoubtedly crippling to the Defendants' position.

In addition, Falck points to a number of factors that it says point in a positive direction toward a finding of justifiable reliance. Among these are that the Defendants were Court-appointed real estate professionals who should have been expected to provide reliable information about the Property which they had been specifically retained to market. Frank actually reviewed bankruptcy documents via PACER including the listing agreements prepared by the Defendants which also showed the Property as being zoned commercial. The Court agrees that being appointed by a bankruptcy court to market real property – in a sense being given the court's imprimatur – does at least elevate the perceived reliability of a broker to the class of potential buyers.

Consider, for example, two substantially similar properties being offered for sale by brokers, one in a purely private sale, the other in a sale under the auspices of a bankruptcy court sale in which the broker has been specifically approved by the court. This Court believes that many buyers would assume they could place more justifiable reliance on the representations of the court-appointed broker simply by virtue of the fact of the court's involvement. Put somewhat differently, a broker in those circumstances is acting with the power and prestige of the court behind it. Cf., *In Re White Crane Trading Co., Inc.*, 170 B.R. 694, 704 (Bankr. E.D. Cal. 1994) ("A judge's order

30

approving a transaction cloaks the transaction with the prestige of the court.  After such a cachet is

conferred, it is susceptible  of abuse.") Thus, the fact that Walnut had been appointed by the Court

to market the Property can be considered as a factor in support of a finding of justifiable reliance by

Falck.

Falck also points out that Lesczynski testified, in her belief, that commercial buyers

relied on the broker's zoning designation, at least when they first look at a property.  Furthermore,

the expert witness called by the defendants, Andrew Gildersleeve ("Gildersleeve"), a commercial

real estate developer, testified to much the same.  Tr. at 115:13-18; 276:20 - 277:2.  Several of the

witnesses who testified at trial stated that in their experience they had never known of a broker

misstating the zoning of the property they were selling.  From that testimony, an inference can be

drawn that, at best, such is a fairly rare occurrence, further suggesting Falck's reliance was

warranted.  Tr. at 132:18-23; 152:1-4; 206:12 - 207:4; 281:5-15.

Counsel for Falck also reminded the Court that throughout the trial the Defendants

focused on a legend appearing on the bottom of each page of the  multi-list materials for the

Property stating "Information Deemed Reliable, But Not Guaranteed."  The Defendants sought

shelter under the  last part of this phrase but Falck persuasively argued that the first part cannot

simply be ignored. "Reliable" is defined as "trustworthy; worthy of confidence."  To represent that

information is deemed reliable is therefore to represent that it can justifiably be relied upon, even

if the representing party is not willing to flat-out guarantee it.[15]

---

[15]     And, of course, the Plaintiff is not suing for a breach of guarantee, but rather for  negligent
misrepresentation.

Finally, there was obviously a considerable "time exigency" involved in the sale process on the Property because of the impending sheriff sale being pursued by Parkvale. While that does not excuse Falck from the burden of showing its reliance was justifiable, it is a circumstance that may be considered in making that determination. Similarly, such a circumstance lends support to a finding of justifiable reliance that would not have been made if the situation had been approached more leisurely. The Court has taken that circumstance into consideration in rendering its decision in this matter.

All of the above are supportive of a finding that justifiable reliance has been shown. The Court is further persuaded in that view by the holding in *Silverman*, *supra*. The evidence in that case showed that the buyer expressed some doubt about the zoning of the property at the closing itself. A representative of the seller then called the local municipality, spoke with an unidentified employee, and was told the property could be used for commercial purposes. The seller's representative reported this to the buyer, who then, apparently reassured, went forward with the sale. Under those facts, which seem less favorable to the buyer than those in the present case, where there was no evidence of any doubt by Falck until after it had signed the Letter of Intent, the *Silverman* court found that a finding of justifiable reliance was supported. The Court thus finds that Falck justifiably relied upon the zoning misrepresentation by the Defendants in entering into the Letter of Intent and committing to buy the Property.

The Plaintiff has thus met its burden of proof as to the existence of a duty of care, and as to all of the elements of the tort of negligent misrepresentation. Having reached that result, the Court would normally move next to a consideration of damages. However, in this case the

32

Defendants have raised a defense of contributory negligence that must be considered next because, if proven, it would defeat the Plaintiff's claim.

### (D)   *Contributory Negligence*

The Defendants argue that since this is a negligence case, but one that does not involve personal injury or property damage, it falls under the Pennsylvania common law of contributory negligence rather than the statutory comparative negligence regime established in *42 Pa. C.S.A. §7102. See, e.g., Gorski v. Smith*, 812 A.2d 683 (Pa. Super 2002) (comparative negligence statute does not apply to all actions for negligence, but only to those resulting in death or injury to person or property). Falck does not dispute the contention that contributory negligence applies in this case and generally, if found to exist, would bar its recovery.

Despite this rare agreement among the Parties, the Court has not been directed to any case under Pennsylvania law where contributory (or comparative) negligence has actually been recognized as a defense to a claim of negligent misrepresentation, nor has its own research revealed any such case. Looking to how this issue has been handled under the laws of other states, the Court finds a split view. A majority of the courts that have considered the matter have concluded that it is appropriate to employ principles of comparative or contributory negligence when the misrepresentation is only negligent, as opposed to intentional. *See, Hicks v. Eller*, 280 P.3d 304, 311 (N.M. App. 2012) (citing cases). However, there is a minority view that rejects the application of comparative/contributory negligence principles as a defense to a negligent misrepresentation claim. *Id.* (citing cases). *See also, e.g., Annot., 22 A.L.R. 5th 464* (2013).

33

Given that the Pennsylvania Supreme Court has not spoken on the issue, and there does not seem to be any controlling precedent from the Third Circuit or the Western District,[16] the Court must predict how the Pennsylvania Supreme Court would hold if faced with the issue. *See, e.g., Mitchell Partners, L.P. v. Irex Corp.*, 656 F.3d 201, 210 (3d Cir. 2011). In that regard, the Court notes that *Restatement (2d) Torts §552A* provides that contributory negligence does apply in claims of negligent misrepresentation. Since the Pennsylvania Supreme Court expressly adopted *Section 552* in the *Bilt-Rite* case, the Court is of the view that it would likely also find that the principle expressed in *Section 552A* should be followed as well. Furthermore, the Court finds that, consistent with the interpretation of *42 Pa. C.S.A. §7102* that has heretofore been given by Pennsylvania courts, the Pennsylvania Supreme Court would likely find that contributory negligence, rather than comparative negligence, should be applied in a negligent misrepresentation case that does not allege personal injury or property damage. Hence, the Court will apply the Pennsylvania common law rule of contributory negligence in this case.

Under the principle of contributory negligence, a plaintiff's recovery is completely barred if the damage suffered is partly the plaintiff's own fault. *Columbia Medical Group, Inc. v. Herring and Roll*, *P.C.* 829 A.2d 1184, 1191 (Pa. Super. 2003) (quoting *Black's Law Dictionary*). The Pennsylvania Supreme Court has defined contributory negligence as follows:

---

[16]    In *Laken v. Fryer Group of Companies*, 32 Fed. Appx. 24, 28, 2002 WL 463405 *4 (3d Cir. 2002) the court upheld a district court finding that the plaintiff in a negligent misrepresentation claim under Pennsylvania law had not been contributorily negligent under the particular facts of the case, thereby implying that contributory negligence can be a defense to such claim. However, the decision was designated as not for publication, and under Third Circuit IOP 5.7 it does not appear to be considered precedential. In *Calgon Carbon Corp.*, *supra*, at Note 14, the court seemed to assume that contributory negligence would be available in a negligent misrepresentation claim under Pennsylvania law, but the actual holding was that it had been waived pursuant to *Fed.R.Civ.P. 8(a)* because it had not been pled as an affirmative defense.

> Contributory negligence is conduct on the part of a plaintiff which falls below the standard [of care] to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant, in bringing about the plaintiff's harm. Contributory fault may stem either from a plaintiff's careless exposure of himself to danger or from his failure to exercise reasonable diligence for his own protection.

*Thompson v. Goldman*, 114 A.2d 160, 162 ( Pa. 1955) (citations omitted).  Contributory negligence is an affirmative defense upon which the defendant bears the burden of proof by a  preponderance of the evidence.  *See, e.g., Franchetti v. Johnson*, 257 A.2d 261, 263 (Pa. Super. 1969).  Conversely put, a plaintiff has no burden to prove freedom from contributory negligence.  *Seewagen v. Vanderkluet*, 488 A.2d 21, 24 (Pa. Super. 1985).  Although the burden of proof is on the defendant, the defendant may point to evidence supplied by the plaintiff which bears on the issue and contributory negligence may be established by the plaintiff's evidence alone.  *Mroz v. Dravo Corp.*, 429 F.3d 1156, 1163 (3d cir. 1970).

Falck points out that the defense of contributory negligence also includes the principle that "[o]ne is not bound to anticipate the negligence of another, that is, it is not contributory negligence to fail to guard against the lack of ordinary care by another." *Gorski, supra*, 812 A.2d at 703 (citing *Bortz v. Henne*, 204 A.2d 52 (Pa. 1964) and *Sullivan v. Wolson*, 396 A.2d 1230 (Pa. Super 1978)).  The Court merely notes this principle for the time being and defers to later a discussion as to how it  impacts the present case, if at all.

Before proceeding any further, another issue must be faced – as a matter of logic, can a plaintiff be found to have "justifiably" relied on a negligent misrepresentation, yet still be found to have been contributorily negligent, and thus barred from recovery?  Put another way, is a

35

plaintiff's freedom from contributory negligence necessarily subsumed within a finding of

justifiable reliance?  The drafters of the *Restatement (2d) Torts* apparently believed it would not be

logically inconsistent to find justifiable reliance, yet then also find contributory negligence.  Some

courts, however, have seemed to express sympathy for a contrary view.  For instance, in *Laken,*

*supra* at n. 12, the court stated:

> The district court determined that the Lakens were not contributorily
> negligent. The same facts that support a finding of justifiable reliance also
> serve to defeat any argument that the Lakens' trust in the validity of the
> investments was negligent. The district court's finding that the Lakens were
> not contributorily negligent is not clear error.

32 Fed. Appx. at 28.  *See also, e.g., Laibi v. McAtee*, 2007 WL 1567689 (Wash. App. 2007) (in a

negligent misrepresentation case, justifiable reliance means the absence of contributory negligence).

The Court does perceive something of a tension between a required element of

justifiable reliance, on the one hand, and the possibility of a contributory negligence defense on the

other.  Nevertheless, perhaps there is a way to resolve the conundrum short of simply adopting an

inflexible rule that equates justifiable reliance with a lack of contributory negligence in all

circumstances, thereby precluding a contributory negligence defense in practice, even if it remains

available in theory.

In particular, the Court is not convinced that contributory negligence must relate to

the reliance aspect of the plaintiff's conduct.  It may be possible that the plaintiff was negligent in

some respect that proximately contributed to the injury, but that the negligence cannot be placed into

the category of "reliance."  In such circumstances, it might be possible to have both justifiable

reliance and contributory negligence in the same case.  The Court must first look to see the exact

ways in which the Defendants contend Falck was contributorily negligent, and then it can consider

whether the defense is effective.

The *Answer* filed by the Defendants alleges that Falck was negligent[17] in the

following respects:

(1)   failing to disclose to the Court its actual knowledge of the zoning designation of the Property

(2)   failing to conduct due diligence as a commercial purchaser

(3)   proceeding with the sale despite actual knowledge of the zoning designation

(4)   failing to properly proceed and conduct itself in the zoning hearings held in Fayette County in accordance with a reasonable and prudent party seeking the change of zoning, including the failure to engage counsel to conduct the zoning proceedings

(5)   failing to appeal the change denial rendered by Fayette County

*Answer* at ¶54.

In their Post-Trial Brief, Doc. No. 79, the Defendants also set forth a list of ways in

which they allege Falck was negligent.  Some of the entries in this list are simply restatements of

---

[17]      The *Answer* does not explicitly plead "contributory negligence" as an affirmative defense, as required by *Fed.R.Bankr.P. 7008*, incorporating *Fed.R.Civ.P. 8(c)(1)*.  It merely alleges that Falck was negligent in a number of respects. This pleading was apparently nevertheless sufficient to put Falck on notice that the Defendants could thereby argue a contributory negligence defense, because in its post-trial brief Falck states that it anticipated the Defendants would do so.  *See*, Doc. No. 80 at 12.  The Court thus finds that contributory negligence was adequately pled as an affirmative defense as required by the *Rules*, and that Falck has not been unfairly prejudiced thereby.

what is set forth in the *Answer*, but some can fairly be described as new,[18] those being (and

continuing with the prior numbering):

(6)    failing to read the appraisals received on November 23, 2010

(7)    failing to determine if "commercial" zoning allowed student housing

(8)    failing to report to the Court any alleged misstatement as soon as it knew about it

(9)    filing a zoning appeal as an LLC without record counsel

(10)    lying to the Court in the motion to rescind filed on February 8, 2011, as to when it became aware of the zoning issue with the Property

(11)    agreeing to proceed with the sale at the February 10th hearing and then doing so negligently and without the benefit of counsel with full knowledge of the zoning issue

*Defendants' Post-Trial Brief* at 15-16.  These various items constitute the "universe" of possible

contributory negligence by Falck and the Court may now turn to a discussion of them.  For

convenience, the Court has numbered them in the lists set forth above and will refer to those

_____

[18]    Under Pennsylvania state court rules of pleading, it is possible any additional alleged grounds of contributory negligence would not be considered since not set forth in the Answer.  However, given the more relaxed federal court notice pleading and the fact that the Plaintiff has not claimed any unfair prejudice or surprise based on these new grounds, the Court will treat them as having been sufficiently pled or tried by consent.  *See, Fed.R.Bankr.P. 7015*, incorporating *Fed.R.Civ.P. 15(b)(2)*.

It should also be noted that throughout the trial, Counsel for Defendant posed questions and made statements that seemed to be based on the premise that Falck was contributorily negligent for proceeding with the sale after the Court made clear at the November 17, 2010 hearing that the hand money would be non-refundable except in very limited circumstances.  *See, e.g.,* Tr. at 74:20 - 75:10; 226:1-5; 236:23 - 237:15.  However, this purported ground of contributory negligence was not set forth in the Answer or the Post-Trial Brief, so the Court has not included it in the above list and indeed could have found that it was waived or abandoned.  Nevertheless, the Court does consider the argument by giving Item 2 (failing to conduct due diligence) a broad construction.  *See, infra,* pp. 50-52.

numbers during the discussion that follows.

It can immediately be seen that the majority of items cited by the Defendants concern actions or failures to act by Falck that would have occurred after it had already entered into the Letter of Intent.  In fact, only two of the items (Items 2 and 7) appear to involve, at least in part,  the time period before the Letter of Intent was signed.  One other item (Item 6) would definitely involve the time period between the Letter of Intent and the December 1st sale order, and three others (Items 1, 3, 8) might also possibly do so, at least under the Defendants' view of things, although under the Court's view they involve the post-December 1st time frame.  All the remaining items (Items 4, 5, 9, 10, and 11) definitely involve the post-December 1st time period.  Thus, since Falck's justifiable reliance on the negligent misrepresentation by the Defendants took place in conjunction with its entry into the Letter of Intent, only Items 2 and 7 would possibly require the special consideration discussed above regarding the question of logical consistency in finding both justifiable reliance and contributory negligence.  The remaining items of alleged contributory negligence occurred *after* Falck had already justifiably relied, so the Court believes there would be no issue in finding both justifiable reliance and contributory negligence as to them – though there might be an issue as to what effect a finding of post-reliance contributory negligence by Falck should have.  Rather than discuss the items of alleged contributory negligence in strict numerical order, the Court will do so in a naturally logical manner.

(1)   *Failure to Determine if Commercial Zoning Allows Student Housing (Item 7)*

The Court chooses to address Item 7 first because it appears to be mischaracterized

as contributory negligence.  In Item 7, the Court understands the Defendants to be saying that, even though Falck was misled by them into mistakenly believing that the Property was zoned "commercial," if Falck had bothered to check the Fayette County Zoning Ordinance it would have discovered that student housing is not a permitted use allowed in a commercial zone under that Ordinance anyway.   Put another way, if the Court's understanding is correct, the Defendants are saying that their negligent misrepresentation was not the proximate cause of any damage to Falck, and therefore they should not be held liable for any such damage.  It is thus something of a misnomer to classify Item 7 as raising a contributory negligence defense, because in actuality it raises an issue of causation.

In any event, regardless how Item 7 is characterized, it obviously depends on the truthfulness of the premise that student housing is not a permitted use under the Ordinance in a commercial zone.  The Defendants have not pointed to anything in the record which would support that premise.  The Court's own review has found little, if anything, to support the premise either. The Defendants' expert witness, Gildersleeve, was asked if, in his experience,  commercially zoned property could be used as student housing.  He testified that, in general, student housing is an area that falls on the "cusp" between commercial and residential, but he provided no testimony particularly concerning whether the Ordinance would allow student housing in its commercial zones. Tr. at 271:2-15.   On cross-examination, Gildersleeve admitted that he has never reviewed the Ordinance and does  not know what zoning designation is required under it  for student housing. Tr. at 271:17-24.

On the other hand, there is considerable evidence in the record tending to show that

the premise of Item 7 is false. Frank testified that Falck had intended to use the Property in a mixed way, hoping to keep all the existing medical tenants, as well as add new tenants such as an urgent care facility, additional medical offices, Marcellus Shale companies and others. Approximately 30% of the building space was intended for use as student housing. Tr. at 35:20-36:5. She testified that a zoning designation of "Business/commercial" was required for all of the intended uses. Tr. at 52:10-12. On cross-examination Frank was asked what she had done to make sure that student housing was a permitted use in a commercial zone. She testified that there were only two business/commercial zonings in the Ordinance, B-1 and B-2, and that "[e]ither would have worked for our project for all of our tenants." Tr. at 66:24-67:6. This conclusion was based on her review of the Ordinance, which she acknowledged did not take place until after the Letter of Intent was signed. Tr. at 67:7-68:17. Burkley testified that he was not exactly sure when he found out about Falck's plans for the Property, but "whenever I did find out that they wanted to do it for student housing, in my book from the zoning perspective, that's a commercial use." Tr. at 247:23-25. Frank also testified, without any hearsay objection by the Defendants, that the Fayette County Zoning Director informed her that the Property would need to be rezoned to commercial for Falck to engage in the uses it had planned, including student housing. Tr. at 51:13-52:12.

The Court concludes that Item 7 rests on a false premise because the record sufficiently establishes that student housing would be a permitted use under the commercial zoning of the Ordinance. The negligent misrepresentation by the Defendants was therefore a causative factor and Item 7 is rejected. Given that conclusion, the possible conflict between justifiable reliance and contributory negligence is not implicated here.

### (2)  Rezoning Efforts (Items 4, 5 and 9)

These Items all involve Falck's efforts to get the Property rezoned after the misrepresentation was discovered.  They can be conveniently considered together as a group.  As to Item 4, there is at least a  factual basis in the record for the Defendants' argument that Falck was negligent in failing to retain counsel to represent it in connection with the effort to rezone the Property since it is not disputed that Falck did not have an attorney representing it in that process. *See, e.g.*, Tr. at 94:23-95:4.  Instead, Frank, who is not an attorney, seems to have taken the lead in representing Falck in the rezoning process.  There was also credible testimony at trial by  Burkley that he had discussions with Frank in which he suggested that Falck should consult with an attorney about the rezoning process.  Tr. at 246:3-12.  Burkley, an attorney with considerable land use and zoning expertise, also stated that he recommended to Frank that he thought Falck should be pursuing a non-conforming use option rather than a rezoning, Tr. at 245:20-25.  Presumably the failure of Falck to do so is something that the Defendants consider to be within the scope of Item 4.

This Court is a strong proponent of parties being represented by attorneys in legal proceedings whenever important rights are at stake and it frequently gives that advice to litigants appearing before it.  Nevertheless, the Court is reluctant to make a finding here that the failure to retain counsel is tantamount to contributory negligence.  Frank  testified that part of her routine duties in her position with Falck is to represent Falck in zoning appeal hearings.  Tr. at 25:18-25.  Thus Falck was being represented by someone with experience in the zoning process, albeit someone who was likely not as ideal for the role as an attorney.  Furthermore, there was no testimony to establish that the standard of care expected of Falck in these circumstances required it to be represented by an attorney in the zoning process.

As to the question raised about whether Falck should have pursued a non-conforming use, rather than a rezoning, Frank testified that she was informed by the Fayette County Zoning Officer that the Property would need to be rezoned to keep the medical offices in compliance.  Tr. at 51:13-18.   Whether that information was legally correct or not, it at least gave Falck a reasonable basis to pursue rezoning rather than a non-conforming use.  Finally, and most significantly, there was no evidence presented at trial to show that a non-conforming use would, in fact, have been granted under the particular circumstances presented.  In the absence of such evidence the Court cannot determine that Falck's failure to pursue a non-conforming use, even if assumed to have been negligent in the abstract, was a legally contributing cause.  *See, e.g., Correll v. Werner*, 437 A.2d 1004, 1005-06 (Pa. Super. 1981) (legal cause standard the same for contributory negligence as for defendant's negligence).  For these reasons, the Court finds that the Defendants have failed to meet their burden of proving contributory negligence as to Item 4.

Items 5 and 9 may be dealt with more quickly because there is no factual support for them in the record.  Item 5 is based on the false premise that Falck did not appeal the denial of the request to rezone.  The undisputed evidence was that Falck did take an appeal and was in the process of pursuing that appeal when it was quashed upon a motion by Parkvale.  Tr. at 56:25-57:7; 92:23-93:1.  Item 9 appears to be based on an unstated premise that Falck's appeal was unsuccessful because it was filed by a limited liability company, or "LLC," on a *pro se* basis.  There is, however, no basis in the record to show that to be the reason why the appeal was quashed.  The Defendants have failed to meet their burden of proof as to Items 5 and 9.

43

### (3)   Motion to Rescind (Items 10 and 11)

The Defendants first argue that Falck "lied" to the Court about when it first became aware of the zoning issue with the Property in its *Emergency/Expedited Motion for Extension of Sale Closing or in the Alternative, Emergency Motion for Rescission*, filed on February 8, 2011. The Defendants are referring to Paragraphs 19 and 21 of the *Emergency Motion* in which Falck alleges that it first became aware of the zoning issue with the Property sometime after December 21, 2010 (as per ¶19) and then specifies the exact date as January 20, 2011, when it claims it was notified by its appraiser that the Property was zoned R-1 (¶21).

These allegations in the *Emergency Motion* are clearly not accurate.  Frank testified that the appraiser's comment about a possible zoning issue occurred on December 16th or 17th.  Tr. at 48:10-49:6.  However, she also testified that this comment only triggered a suspicion of a zoning issue, which she did not regard as being confirmed until she was informed of the zoning on the Property by Sara Rosiek of Fayette County on January 24, 2011. Tr. at 51:13-18.   While the *Emergency Motion* was thus not entirely accurate on the topic of when and how Falck became aware of the zoning problem, it is only a few days off from the actual events.  The Court is reluctant to ascribe the inaccuracy to a deliberate lie when it could as easily have been caused by miscommunication.  More importantly, even if the Court were to assume, *arguendo,* that there was a deliberate decision to mislead the Court, the Defendants have not shown how that would be contributory negligence.

Turning to Item 11, the Defendants assert that Falck was contributorily negligent for agreeing to proceed with the sale at the February 10th hearing and then doing so negligently and

without the benefit of counsel.  The factual premise of this argument is lacking because Falck <u>was</u>

at that point represented by counsel in connection with the sale.  Tr. at 52:17-25; 165:9-19.  Indeed,

counsel filed the *Emergency Motion* on behalf of Falck and appeared at the hearing on it.  The

Defendants offer no further particulars as to how Falck was allegedly negligent with respect to the

sale following the February 10, 2011 hearing.  Therefore, the Defendants have failed to meet their

burden of proof as to Items 10 and 11.


### (4)  K*nowledge of Misstatement (Items 1,3,6 and 8)*


These  Items are grouped together for consideration because they all relate in some

fashion to Falck's knowledge as to the Defendants' misstatement, and what Falck did or did not do

in response.  The Court begins with a finding that December 16 or 17, 2010,  *i.e.*, the date Falck's

appraiser indicated his suspicion that there could be an issue with zoning,  is the earliest possible

time at which Falck can be charged with having actual knowledge that a misrepresentation

concerning the zoning of the Property may have been made.  The Defendants attempt to push this

date back to November 23, 2010, the date on which  Shiner on behalf of Parkvale supplied Frank

with copies of two earlier appraisals of  the Property that both indicated a residential zoning for the

Property.  Tr. at 77:10-78:2; Exhibits 4, 5.  Frank had requested the appraisals because she thought

an appraisal may have been obtained somewhat recently, during the course of the bankruptcy

proceeding.  Tr. at 98:2-6.  The Defendants argue that Falck should have read those appraisals and

thereby learned that the actual zoning on the Property may have been different than the Defendants

had represented.  Although at first appealing to the Court, after further consideration now that all

the liability testimony has been presented, that argument is rejected.  The two appraisals were from

2004 and 2007, and the later appraisal did not even include the hospital building.  All of the witnesses who were asked agreed that they would place no reliance on an appraisal that was three years old, let alone one that was six years old and preceded the real estate downturn precipitated by the financial collapse of late 2008 and 2009.  Tr. at 97:9 -98:1; 279:5-9.

Based on the above, Item 6 clearly fails since it would not have been negligent to fail to read appraisals that were so outdated as to be unreliable.  In other words, even though Frank requested the appraisals from Parkvale, once she received them and saw how old they were,  it was not unreasonable for her to fail to review them, or to do so in only a cursory manner that did not pick up the detail about the zoning information.

With respect to Item 1, the Defendants argue that Falck was contributorily negligent for failing to inform the Court of its actual knowledge of the zoning designation, while in Item 8 Falck is alleged to have been contributorily negligent for failing to inform the Court about the zoning designation as soon as it found out.  These two allegations are, of course, somewhat inconsistent.  Item 1 seems to presuppose that Falck <u>never</u> made a disclosure to the Court, while Item 8 acknowledges that Falck did disclose, but argues that it was made too late.  The record is clear that Falck did make a disclosure to the Court, in the *Emergency Motion* filed on February 8, 2010.  Thus, there is no basis for Item 1.

The Court is of a mixed view on Item 8.  Clearly, at least in hindsight, it would have been better if Falck had brought the zoning issue to the Court's attention at the earliest possible opportunity, *i.e.*, in mid-December when it first learned there might be a problem.  However, the question is whether Falck was negligent for not doing so.  The Court concludes that Falck was not

negligent for a couple of reasons. First, Frank testified credibly that Falck did not have confirmation about the Property's actual zoning status until January 24, 2011, and that prior to that date on Falck's part there was still thought to be some possibility that zoning would not be an issue. The activities that took place between mid-December and January 24th were in the nature of a party making its best efforts to, first, try to resolve a difficult situation on its own, rather than immediately running to the Court, something that is normally viewed as praiseworthy, not negligent. It did take two weeks after January 24th before the Court was informed about the zoning issue, which is on the long side, though not so long as to compel a finding of negligence.

The second, and more significant reason for finding that Item 8 does not establish contributory negligence is that the Defendants have provided no convincing explanation as to how an earlier disclosure to the Court would have changed the ultimate result in this matter. The Letter of Intent had already been signed by the time Falck had knowledge of the possible zoning issue, so to that extent Falck was already bound. Furthermore, the December 1st hearing confirming the sale to Falck and changing the terms of the agreement had occurred as well. Perhaps an earlier disclosure could have somehow changed things, but equally well, perhaps not. The Defendants have provided no evidence to persuade the Court that, more likely than not, an earlier disclosure would have accomplished anything positive for Falck.

Turning finally to Item 3, the Defendants contend that Falck was contributorily negligent for proceeding with the sale despite actual knowledge of the zoning designation. However, as discussed above, the Court finds that Falck did not have actual knowledge of the zoning designation until December 16th or17th at the earliest, by which time the Letter of Intent had already

47

been signed.  Even if Falck had wanted to simply walk away from the sale at that time, it is questionable whether it had the ability to do so without thereby breaching a contract.[19]  Under the circumstances, Falck cannot be charged with contributory negligence for proceeding forward with the sale while taking steps in an attempt to ameliorate or remove the zoning issue.  The Defendants have thus failed to meet their burden of proof with respect to Items 1, 3, 6 and 8.

(5)  *Failure to Conduct Due Diligence as a Commercial Purchaser (Item 2)*

As indicated above, this Item potentially involves action or inaction  that may predate the signing of the Letter of Intent, and therefore can be said to predate Falck's reliance on the Defendants' misrepresentation.  The Court has previously found that Falck's reliance was justifiable.  Included within that discussion was a finding that Falck was under no legal duty to check the zoning status of the Property before entering into an agreement to buy it where Falck did not know of the falsity of the zoning representation, nor was its falsity obvious.  Furthermore, as also noted above, Falck has pointed to case law for the proposition that it is not contributory negligence to fail to anticipate the negligence of another and guard against it. *Gorski, supra*.  Thus, Falck was not required to anticipate that the Defendants would negligently misrepresent the zoning status of the Property.  The Court has  also previously noted that it was the unanimous view of the witnesses who testified to the point that none was aware of a prior instance of a zoning misrepresentation by a real estate broker.  Tr. at 132:18-23; 152:1-4; 206:12 - 207:4; 281:5-15.

---

[19]    Indeed, despite the efforts it made as set forth herein, Falck was sued for breach of contract with respect to the failure to close on the Property. *See*, *Slone v. Falck Properties, LLC*, Adv. No. 13-2157-TPA.

The Court thus finds that, in general terms, Falck was not guilty of contributory negligence for failing to conduct any particular sort of due diligence related to the zoning of the Property prior to entering into a contractual relationship with Slone to purchase it. Falck was entitled to assume that the Defendants had taken reasonable care in determining the zoning status of the Property, particularly where the Defendants were acting under the authority of the Court and where the materials they provided to Falck were stated to be "deemed reliable." Thus, to the extent that Item 2 is related to what Falck did or did not do in the pre-contract time period concerning due diligence as to zoning, it must be rejected. The Court, however, does not view Item 2 as being that narrow in scope.

Even though not explicitly stated in their *Answer* or Post-Trial Brief, the Defendants seem to include more in their argument about a lack of due diligence by Falck than just a pre-contract failure to confirm that the zoning of the Property was accurately stated by the Defendants. The Court discerns two other lines of argument by the Defendants that could fit under the due diligence rubric of Item 2. First, the Defendants contend that Falck was contributorily negligent for failing to include a zoning or financing contingency in the Letter of Intent. Second, they argue that Falck was contributorily negligent for agreeing to proceed with the sale after the November 17, 2010 hearing.

The first of these arguments is dependent on there being a standard of care whereby a reasonable commercial developer would not enter into an agreement to buy property without including a zoning or financing contingency within it that would allow the buyer to escape the agreement and recover its deposit if the zoning proved to be different than advertised, in a way that

49

prevented the intended use, thus jeopardizing the developer's financing for the purchase. The only witness who testified as to the general area of the standard of care for commercial developers was the Defendants' expert, Gildersleeve.  The bulk of his testimony concerned what reliance he placed on information provided by real estate brokers as to the zoning of a property being considered for purchase. Gildersleeve testified credibly that he personally does not rely on such information from the broker, but instead makes a trip to the zoning office and talks to the people there himself.  Tr. at 270:13-271:1; 271:23-272:10.   His testimony, however, was not clear as to whether this was something that would be done before or after an agreement of sale had been entered.  Furthermore, he was not asked whether the standard of care required a contingency for this purpose to be included within the agreement of sale.

Additionally, when Gildersleeve's testimony did touch on the standard of care expected in the industry, as opposed to just his own personal practice, he was asked, and he answered, as follows:

> Q.    Sir, are you familiar with what other commercial developers do in relation to due diligence and, in particular, in relation to zoning?
>
> A.    I suspect most are like me in that they'll take it to the next level and they'll either make a trip, or at the very least have a phone conversation with the appropriate municipal authorities.

Tr. at 271:16-22.  The Court questions whether this statement, based on suspicion, is sufficient to establish a standard of care, and in any event, it says nothing about including any contingency in a sale agreement.

Even if the Court assumes that, in general, it is prudent for a developer to include a

zoning/finance contingency in any binding agreement, including one labeled as a "letter of intent,"

there was a reason why that was not feasible under the circumstances presented here.  The long and

sometimes acrimonious history of efforts by Slone to sell the Property, in the face of Parkvale's

countervailing attempts to resist those efforts and instead obtain relief from stay or dismissal of the

case so it could be sold at sheriff sale,[20] made it  extremely unlikely that the Court would ever have

approved of a proposed sale with this type of contingency.  Burkley, who was closely involved in

the sale process on behalf of the seller, testified that the only contingency the seller found reasonable

was "just delivering clear title."  Tr. at 242:1-6.  The Court thus finds that a zoning contingency was

not feasible in this case, and Falck was not contributorily negligent for proceeding without such a

contingency when it had justifiably relied on the Defendants' representation that the Property was

commercially zoned.

In the second contention, the Defendants are saying, in effect, that the events at the

November 17, 2010 hearing, at which the Court required an $80,000 increase in the hand money,

from $100,000 to $180,000 ($50,000 of which increase would come from Falck), coupled with the

Court's admonition that the hand money was non-refundable except in very narrow circumstances,

should have triggered some kind of alarm in Falck that made it negligent to proceed further.

However, other than increasing the amount of hand money, nothing had fundamentally changed

between the signing of the Letter of Intent and the November 17th hearing.  Falck was still laboring

under the Defendants' negligent misrepresentation of the zoning on the Property as being

commercial.  Nothing had yet come to light to even raise a question about zoning.  Falck had already

---

[20]      The sequence of events between those parties was characterized as a " war" by Parkvale's
attorney at the November 17, 2010 hearing on the sale motion, a description with which Burkley agreed.  *See*,
Transcript of November 17, 2010 hearing at 6:14-15; 7:21-22, BPC Doc. No.  197.

committed a $100,000 hand money deposit to the agreement, so it was already at risk. The required increase in the hand money was just a change in degree, not in kind.  The Court finds that a reasonable buyer in Falck's position, acting in justifiable reliance on the zoning designation provided by the Defendants, could have agreed to increase the size of its hand money deposit, rather than have the agreement rejected,  without thereby being contributorily negligent.

To quickly sum up, the Court finds that the Defendants have failed to meet their burden of proof on the affirmative defense of contributory negligence.  In light of that, and the previous finding that Falck met its burden of proof on the  negligent misrepresentation claim against the Defendants, the Court now turns to a consideration of damages.

## *DAMAGES*

There is little Pennsylvania case law on the proper measure of damages for negligent misrepresentation.  In  *Bobin v. Sammarco*, 1995 WL 303632 *3 (E.D. Pa. 1995)  the court stated that the measure is "actual loss."  Other courts have relied on *Restatement (2d) Torts, §552B*, entitled "Damages for Negligent Misrepresentation, which provides:

> (1)   The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
> > (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
> >
> > (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.
>
> (2) the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

52

*Restatement (2d) Torts §552B.*

In this case, Falck seeks recovery for the following damages[21] (rounded to nearest

dollar):

- Hand money paid                                          $ 150,000
- Appraisal of Property  by Kulzer                           7,500
- Appraisal of Property by Barone & Sons                     2,500
- Appraisal of Langan property by Kelly-Reilly               4,000
- Phase I environmental study by CP Env. Gp.                 3,950
- Fidelity Bank commitment fee                               8,000
- First Federal commitment fee                               4,350
- Title search fee                                           6,446
- Dickie McCamey legal fees                                 51,141
- Survey of Property                                        10,000
- Insurance on Property                                      1,311
- Repairs of vandalism on Property                          16,400
- Filing fee for petition to rezone                           485
- Increased premium on contractor's insurance               3,850
                                            TOTAL       $ 269,933

The Defendants raised a question at trial as to why they should be held responsible for any expenses

incurred by Falck in connection with its effort to obtain financing for the purchase of the Property

because the Letter of Intent does not have a provision for a financing contingency.   In fact, the

---

[21]      Prior to the start of trial there was a dispute as to whether the Defendant had been provided
with sufficient documentation to support the items being claimed as damages.  As a result, the Court deferred
any testimony as to damages until after the lunch break to allow time for the attorneys for the Parties to confer
and determine if they could resolve any dispute as to what the Defendant had been provided.  Following the
lunch break, Counsel for Falck reported that the attorneys had met and that as a result, Falck was withdrawing
its claim for certain items of damage because it had not previously provided documentation for them to the
Defendants' attorney.  The Defendants' attorney indicated general agreement and did not raise any further
objection.  As a result, the Court considers the matter as having been resolved and any objection waived. *See*,
generally, Tr. at 156:73-161:8. *See, Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 517-18 (3d Cir. 1997)
(if party files a motion in limine seeking exclusion of evidence at trial and court makes tentative ruling subject
to reconsideration at trial, party must renew objection at trial or it will be found to have been waived).

Letter of Intent specifically states that it is not contingent upon financing. *See* Exhibit E. Without more in the record, this certainly suggests that Falck already had the means of financing the purchase of the Property lined up. The Court agrees that in these circumstances applying the *§522B* standard quoted above from the *Restatement (2d) Torts*, the Defendants should not be responsible for expenses incurred by Falck related to financing. Thus, the expenses of appraisals, commitment fees, the environmental study, and the survey will not be allowed as damages because the Court finds that the misrepresentation should not be considered a legal cause of them.

   The Court itself raised an issue as to the recovery of damages for legal expenses because of insufficient proof provided by Falck. Falck did not provide an itemized list of the time entries that went into the $51,141 it claims to owe the Dickey McCamey law firm related to the failed sale, merely an overall summary listing the various timekeepers and showing the total time charged by each. Without at least an itemized statement and preferably testimony explaining the services rendered in relation to the facts of this case, it is impossible to determine if all or any of the time involved can fairly be attributed as a consequence of the sale. It is also impossible to determine if the individual time entries are reasonable. The Court would not grant a fee petition from professionals in this bankruptcy with such scanty evidence as Falck presented, nor will it award attorney fees as damages in this case for similar reasons. The Plaintiff has failed to meet its burden by a preponderance of the evidence regarding this alleged item of damages.

   The remaining items sought by Falck are found to have been legally caused by Falck's justifiable reliance on the Defendants' negligent misrepresentation consistent with the *§522B* standard, sufficiently proven, and otherwise necessary to compensate Falck for its pecuniary losses.

Clearly, the $150,000 in hand money paid was directly attributable to the negligent misrepresentation by the Defendants.  Falck would not have entered into the Letter of Intent or paid the hand money but for the misrepresentation.  The $6,446 title search fee would not have been incurred without the Letter of Intent.  The increased insurance payments totaling $5,161 were a direct result of Falck's obligations under the agreement.  The $16,400 in vandalism repairs were paid by Falck solely due to its status as a buyer under its agreement.  Finally, the $495 paid for the petition to rezone was a reasonable expense incurred in an effort to mitigate the damages from the Defendant's misrepresentation.  Judgment will therefore be entered in favor of Falck and against the Defendants in the amount of $178,492.[22]

An appropriate order follows.

Dated: August 1, 2013

_____
Thomas P. Agresti, Chief Judge
United States Bankruptcy Court

Case administrator to serve:
    David Fuchs, Esq.
    Richard Parks, Esq.

---

[22]    In its prayer for relief, the Plaintiff also sought interest and punitive damages.  By "interest," the Court assumes the Plaintiff to mean pre-judgment interest.  The Court will not award any pre-judgment interest at this time but will provide the Plaintiff with a 21 day window to file a motion to that effect.  As to any claim for punitive damages, the case was tried solely on a negligence theory and hence no punitive damages may be awarded.  *Boring v. Google, Inc.,* 364 Fed.Appx. 273, 282 (3d Cir. 2010).